**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys For Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARKER BOVENBERG, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| U.S. BANCORP, | **JURY TRIAL DEMANDED** |
| Defendant. | |

CLASS ACTION COMPLAINT

Plaintiff Parker Bovenberg ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant U.S. Bancorp ("Defendant" or "US Bank").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who applied for a credit card on U.S. Bank's website, usbank.com (the "Website").

2. Defendant aided, employed, agreed, and conspired with Facebook to intercept communications sent and received by Plaintiff and Class Members, including communications containing sensitive financial information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

3. Plaintiff is, and has been at all relevant times, a resident of San Jose, California and has an intent to remain there, and is therefore a domiciliary of California.  Plaintiff has an active Facebook account that he has maintained for numerous years.  Pursuant to the systematic process described herein, Defendant assisted Meta with intercepting Plaintiff's communications on the Website, including those that contained personally identifiable information ("PII") and sensitive financial information.  Specifically, in or about February 2024, Plaintiff applied for a credit card on usbank.com.  As part of the application on the Website, Plaintiff provided Defendant with multiple pieces of sensitive information, including but not limited to his social security number and his total gross annual income.  In April 2024, Plaintiff was informed that his application was rejected.  As described below, Defendant used the Facebook Tracking Pixel on the Website to send all of this information to Meta without Plaintiff's knowledge, consent, or express written authorization.  By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected financial information.

4. Defendant U.S. Bancorp is incorporated in Delaware and has its principal place of business in Minneapolis, Minnesota. Defendant one of the largest banking institutions in the United States.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

6. The Court has specific personal jurisdiction over Defendant because it conducts business in California. As such, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**FACTUAL ALLEGATIONS**

**I.   The California Invasion of Privacy Act**

8. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

9. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985).

10. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device*.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Id.*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

11. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

12. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

15. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. The Facebook Tracking Pixel

16. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform," meaning users are allowed only one account and must share "the name they go by in everyday life." To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

17. Facebook generates revenue by selling advertising space on its website.

18. Facebook sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

19. Advertisers can also build "Custom Audiences." Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities." Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Facebook Tracking Pixel.

20. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take." When the Facebook Tracking Pixel captures an action, it sends a record

to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

21. The Facebook Tracking Pixel tracks numerous types of action—or, as Facebook calls it, "events"—that users take on websites, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.  Events tracked through the Pixel include URLs visited and text typed into text boxes, among many other items.

### III. Use of the Facebook Tracking Pixel on Defendant's Website

22. Defendant provides applications for its various credit cards on its Website.  The Facebook Tracking Pixel is installed on each webpage used for these applications.

23. These applications require applicants to provide their names, social security number, dates of birth, email addresses, phone numbers and home addresses.  Applicants are also required to provide their social security numbers and sensitive financial information such as their total annual income, source of income, and monthly housing payment:





**Housing**

Monthly housing payment

Enter a whole dollar amount. If you don't pay for housing, enter 0.

**Country**

Country of citizenship

Select country of citizenship

24. The Facebook Tracking Pixel on these application pages track all of the information that applicants enter and send that data to Facebook without applicant's consent or knowledge. In fact, the Meta Business Tools Terms specifically require Pixel users like Defendant to "represent and warrant" that they will not share data with Meta that includes "financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."

25. In addition, usbank.com contains the code for at least nine different Facebook cookies:

| Name | Value | Domain |
|---|---|---|
| wd | 1155x524 | .facebook.com |
| ps_n | 1 | .facebook.com |
| c_user | 679395441 | .facebook.com |
| fr | 1arOLR85bes7pnnx… | .facebook.com |
| xs | 165%3AjYP2J9Bb8vt… | .facebook.com |
| ps_l | 1 | .facebook.com |
| dpr | 1.662500023841858 | .facebook.com |
| sb | jVa6YaHou2Nev98LS… | .facebook.com |
| datr | D8aAZZE7dAvjNYke… | .facebook.com |

26. When someone who is logged into Facebook applies for a credit card on usbank.com, the Pixel transmits PII from these Facebook cookies to Facebook along with their event data, including their sensitive financial information. For instance, the c_user cookie contains a visitor's Facebook ID.

CLASS ACTION COMPLAINT    6

27.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com.

28.     The combination of the event data and the PII from Facebook's cookies embedded on usbank.com permits Facebook to see sensitive financial information for specific individuals.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff seeks to represent a class of all California residents who applied for a credit card on Defendant's Website while in California (the "Class").

30.     Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

31.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

32.     Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

33.     **Numerosity.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  Class Members can be readily identified from Defendant's records and non-party records, such as those of Meta.

34.     **Typicality.**  Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other members, visited Defendant's Website and had their confidential information intercepted and disclosed to a third party.

35. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

36. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include, but are not limited to, the following: whether Defendant violated CIPA and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

37. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

38. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

39. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

40. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

41. Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

42. At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

43. When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy. Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

44. Plaintiff and Class Members did not consent to any of Facebook's actions. Nor have Plaintiff or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

45. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and are therefore entitled to statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the putative Class, naming Plaintiff as the

representative of the putative Class, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: June 4, 2024    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Philip L. Fraietta*
       Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiff*